NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 29, 2024

S24A0321. HARRIS v. THE STATE.

PINSON, Justice.

Appellant Leslie Harris pleaded guilty to malice murder and other crimes in connection with the shooting death of Michael Anthony Davenport.[1] She later moved to withdraw her guilty pleas, asserting that certain mental health issues had prevented her from entering a knowing and voluntary plea. The trial court denied the

---

[1] The crimes occurred on October 5, 2017. On January 2, 2019, a Richmond County grand jury indicted Harris for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), armed robbery (Count 3), and possession of a firearm during the commission of a crime (Count 4). On September 27, 2019, Harris pleaded guilty to all counts except Count 2, which was nolle-prossed. Harris was sentenced to life in prison for Count 1, a concurrent life sentence for Count 3, and a consecutive 5-year sentence for Count 4. On November 14, 2019, Harris timely moved to withdraw her guilty pleas. Following a hearing, the trial court denied Harris's motion on August 18, 2023. Harris timely filed a notice of appeal to the Court of Appeals on August 25, 2023, which was transferred to this Court on November 1, 2023. See *Harris v. State*, No. A24A0445 (Ga. App. Nov. 1, 2023). The case was docketed to the term of this Court beginning in December 2023 and submitted for a decision on the briefs.

motion, and she now appeals that decision. But the record supports the trial court's conclusion that Harris's plea was knowing and voluntary, so we affirm the trial court's decision.

1. (a) Three days before her scheduled trial date, Harris entered a negotiated guilty plea to malice murder, armed robbery, and possession of a firearm during the commission of a crime. At the plea hearing, the State provided the following factual basis for the plea. Harris and Davenport were in a tumultuous relationship highlighted by Harris's physical abuse of Davenport and Davenport's infidelity. On October 1, 2017, four days before the murder, Harris and Davenport were staying at a hotel when they got into an argument and Davenport left and went to stay at a hotel next door. The State explained that, according to Davenport's family, "he was ending the relationship for good at this point." The State asserted that surveillance footage showed that Davenport was alone at the hotel until October 4, when he and a woman were seen going into his room. Around 11:57 p.m., Davenport left his hotel room to throw away trash. Around 12:27 a.m., on October 5, Harris was seen walking by

2

Davenport's room while on her cell phone and going upstairs to the hotel's second floor. Around 12:50 a.m., the woman who was with Davenport left his room and went to her car. At 12:52 a.m., Davenport's hand is seen coming out of the hotel room and waving goodbye. Soon after, the State asserted, the surveillance footage showed Harris "bolt[ing]" toward Davenport's room, having a conversation with the woman outside of Davenport's room for a couple of minutes, and at 12:56 a.m., entering Davenport's room. About 30 minutes later, Harris left Davenport's room carrying a large duffle bag which she threw in the back of Davenport's truck. Harris then got in the truck and drove back to her hotel. She woke up her two daughters, packed up her hotel room, loaded her belongings in Davenport's truck, and left by 2:00 a.m.

Early the next afternoon, a hotel clerk found Davenport's body lying on the floor of his hotel room. He was dead and had three gunshot wounds. The State asserted that based on the surveillance footage, Harris was the last person to see Davenport before he was found dead. According to the State, she shot him three times, stole his

property, including his truck, "and left him to die."

Before the plea hearing, Harris and plea counsel completed and signed a form called "Plea of Guilty (Nolo Contendere) Acknowledgement and Waiver of Rights." One of the questions on the form asked, "To your knowledge, do you now suffer from any mental illness or psychological disorder?" Harris initialed both "Yes" and "No" in response to this question. During the plea colloquy, the trial court asked about these conflicting answers, and Harris explained that she had been diagnosed with depression and bipolar disorder. Harris further explained that she did not know exactly when she was diagnosed but that she had been prescribed medication for her diagnoses. The trial judge ultimately circled "Yes" next to the question asking whether Harris suffered from "mental illness or psychological disorder" and put her own initials to the side of the circle to confirm the accuracy of the answer on the form.

When the trial court first asked Harris if she was taking her prescribed medication while in jail, Harris said, "No. Some . . . . [I'm s]upposed to take it every day, twice a day." Later in the colloquy,

4

the court asked Harris a second time whether she was taking her prescribed medication while in jail. Harris said, "Yes, I am," and she noted that she did not take it the day of the plea hearing because she was brought to the court early in the morning, but she had taken it the day before. The court also asked Harris whether she "fe[lt] okay" and Harris responded that she did. When asked whether Harris understood why she was in court that day, Harris first responded, "For a trial." When the court informed Harris that was not the case, Harris said, "Oh, sentencing." So the court asked Harris if she knew what that meant, and Harris responded, "We're here for sentencing." The court then asked Harris whether she wanted to admit to killing Davenport or if she wanted to go to trial. Harris responded that she "just want[ed] it over with" and was prepared "to admit it." The court then asked Harris whether she understood what would happen after she was sentenced, and Harris responded, "I'm going to the [] prison." At various points throughout the plea hearing, the court asked whether Harris understood why she was in court, how she felt, and if she understood the different questions she was asked,

5

and Harris affirmed that she understood and that she felt "okay." The trial court also asked Harris whether she had an opportunity to review her case file, discuss it with her attorney, whether she had questions about it, and whether she was satisfied with her attorney's representation. Harris responded that she was able to review the file, was able to discuss it with plea counsel, had no questions, and was satisfied with her plea counsel's representation.

The court also asked plea counsel about his interactions with Harris, and plea counsel explained that he was able to have meaningful conversations with Harris throughout his representation of her and that she was able to assist in her own defense. Plea counsel explained that he discussed Harris's mental health issues with her, and that the two had discussed the case to their "satisfaction" and "were able to effectively discuss what she was charged with, what the possible defenses would be," including their discussion of "the possibility of self-defense in this case." Based on those discussions, Harris decided to "waive those defenses in order to accept the State's offer." Plea counsel also explained that given Harris's mental-health

diagnoses, he considered a competency evaluation, but ultimately decided not to request one because he "believe[d] she was competent to go forward[ ] based on [his] conversations with her."

During the plea hearing, the trial court asked, and Harris confirmed, that she was not under the influence of any drugs or alcohol, and that she had not been forced or threatened in any way or promised anything to make her plead guilty. Harris further confirmed that she understood the constitutional and legal rights she was waiving by pleading guilty. The court also reviewed with Harris both the maximum sentence she could receive should she proceed to trial and the negotiated plea offer, which Harris acknowledged she understood.

Harris then admitted to killing Davenport and taking his truck, pleaded guilty, and the Court accepted her plea, finding that it was entered "freely, voluntarily, and knowingly."

(b) On November 14, 2019, Harris timely moved to withdraw

her guilty pleas.[2] On August 9, 2023, the trial court held a hearing on the motion and heard testimony from Harris's plea counsel.[3] Plea counsel testified about his representation of Harris generally, including his review of the evidence and the waiver-of-rights form with Harris and their discussions about entering a guilty plea, as well as his determination that she was competent to enter a plea. Plea counsel testified that prior to the plea hearing, he discussed with Harris the possible sentences she faced as well as the possible defenses that were available to her, and that Harris had some concerns but ultimately "wanted to go forward with it." He also recalled Harris's mental-health diagnoses and explained that his standard practice would have been to ensure that she understood what was going on, where she was, and what she was pleading to, including the nature of the

---

[2] The deadline for filing a motion to withdraw a guilty plea is the end of the term in which a trial court enters a judgment of conviction and sentence is pronounced. See *Powell v. State*, 309 Ga. 523, 524 (1) & n.1 (847 SE2d 338 (2020) (citation omitted). Harris's motion to withdraw her guilty pleas was filed before that deadline. See OCGA § 15-6-3 (5) (B) (terms of court for Richmond County begin on the third Monday in January, March, May, July, September, and November).

[3] While Harris's plea counsel filed the motion to withdraw her pleas, she was represented by new counsel at the motion to withdraw hearing.

charges and potential consequences of pleading guilty or going to trial. Plea counsel also explained that he did not seek a competency evaluation because "[Harris] didn't appear to have . . . anything involving, like, hallucinations or anything that would lead [him] to believe that she was not competent at that time to make a decision." Plea counsel explained that he "never got [the] impression" that Harris "didn't know what was going on or that what she was doing wasn't voluntary." Harris did not testify at the hearing and presented no other witnesses or evidence.

2. Harris contends that the trial court erred in denying her motion to withdraw her guilty pleas because her mental-health issues prevented her from entering a knowing and voluntary plea.

"After sentencing, the decision on a motion to withdraw a guilty plea is within the trial court's discretion, and withdrawal of the plea is allowed only when necessary to correct a manifest injustice." *Powell v. State*, 309 Ga. 523, 524 (1) (847 SE2d 338) (2020). We have said that "withdrawal is necessary to correct a manifest injustice if, for instance . . . the guilty plea was entered involuntarily or

9

without an understanding of the nature of the charges." Id. (cleaned up).

When a defendant moves to withdraw a guilty plea on the basis that it was not knowing and voluntary, the State bears the burden of showing that the plea was knowing and voluntary based on all the relevant circumstances. *Johnson v. State*, 303 Ga. 704, 707 (2) (814 SE2d 688) (2018) (citation omitted). To assess whether the plea was knowing and voluntary, the trial court must consider whether the plea was the result of the defendant's own free choice, made with sufficient awareness of the relevant circumstances and likely consequences. *Green v. State*, 318 Ga. 610, 614 (II) (898 SE2d 500) (2024) (citing *Brady v. United States*, 397 U.S. 742, 748 (I) (90 SCt 1463, 25 LE2d 747) (1970)). These relevant circumstances and likely consequences generally include "the nature of the charge to which the defendant is admitting guilt, the factual basis of the charge, the punishment to which the plea will expose him, the terms of any negotiated agreement with the government, and the rights the defendant

10

will waive by entering the plea." Id. at 616 (II) (A) (1) (citations omitted). When reviewing a trial court's determination that a defendant's plea was knowing and voluntary, we review the court's factual findings for clear error, but the ultimate determination is reviewed de novo. See *Ward v. Medina*, 316 Ga. 345, 351 (2) (888 SE2d 84) (2023).

The record here supports the trial court's determination that Harris entered a knowing and voluntary plea. During the plea colloquy, the trial court questioned Harris to determine if she understood why she was in court that day, whether she understood the nature of the charges against her, possible sentences, and the rights she was waiving by pleading guilty. In response, Harris said that she wanted to "admit" to killing Davenport and was there for "sentencing," which she understood meant she was "going to the [] prison." She also acknowledged that she understood the maximum sentence she could receive should she proceed to trial and the rights she was waiving by pleading guilty. Harris affirmed multiple times that she understood that she was giving up her right to a jury trial, and that

11

she had discussed her case, including possible defenses, with her attorney to her "satisfaction." Throughout the hearing, the trial court asked Harris whether she "underst[ood] what's going to happen if [she gets] sentenced," and whether Harris "agreed to" go to prison, and Harris responded that she did.

The court also reviewed Harris's waiver-of-rights form to confirm Harris's understanding and knowledge of that form and the rights she was giving up, and the court specifically clarified Harris's responses about her mental-health diagnoses and asked about her medical history. When asked about the form, Harris described her diagnoses and treatment for bipolar disorder and acknowledged that she had not taken her prescribed medication the day of the plea hearing, but that she had taken it the day before and "fe[lt] okay." Plea counsel affirmed his belief that Harris was competent to proceed and that she was able to assist in her own defense based on their conversations about her case and possible defenses. So it is clear from the record of the plea hearing that the trial court consid-

ered Harris's mental-health diagnoses and treatment and her ability to communicate with counsel and the court to conclude that she understood the nature of the charges, rights she was waiving, and consequences of entering her plea, and her responses and those of plea counsel amply supported the court's conclusion that Harris's plea was knowing and voluntary. See *Oliver v. State*, 308 Ga. 652, 655 (2) (842 SE2d 847) (2020) (holding that appellant was advised of his rights and understood that he was waiving those rights by pleading guilty where appellant signed a waiver-of-rights form and the trial court entered an order contemporaneous with the guilty plea finding the plea was "freely, understandingly, and voluntarily made" (cleaned up)); *Phelps v. State*, 293 Ga. 873, 875-878 (2) (a), (b) (750 SE2d 340) (2013) (concluding defendant's completed waiver-of-rights "questionnaire" was "evidence which, in conjunction with the record of the plea hearing" demonstrated that defendant's plea was knowing, voluntary, and intelligent where defendant claimed, among other things, that he was not mentally competent to enter his plea).

Harris now claims that her mental-health diagnoses at the time—depression and bipolar disorder—and the "irregularity" in taking her medication at the time, did not allow her to "exercise reasonable decision making or "sufficiently understand the consequences of her decision to plead guilty." But the trial court probed both Harris and her plea counsel about these diagnoses and their potential effect on her understanding of the proceedings and the consequences of her plea, as detailed above. The trial court asked Harris about her mental-health diagnoses, including whether she was taking her medication in jail, and Harris described her mental health history and treatment. In particular, she affirmed that she was taking her medicine, including having taken it the day before the hearing, and she affirmed that she had not taken it that day because she was "brought over so early." The record contains no evidence that this schedule of taking her medication affected her ability to enter a knowing and voluntary plea. And although Harris first said she believed she was in court "for a trial" and later, for "sentencing," on further inquiry from the court, Harris affirmed multiple times that

she understood she was in court "to admit" to killing Davenport and that she understood she was "going to the [ ] prison," had discussed her case with plea counsel, and ultimately wanted to admit to killing Davenport and taking his truck instead of going to trial. Before accepting Harris's guilty plea, the trial court asked plea counsel about his interactions with Harris and plea counsel responded that he was able to have meaningful conversations with Harris and that she was able to assist in her own defense, including in deciding to waive certain defenses and accept the State's offer. And at the motion to withdraw hearing, plea counsel testified that he believed Harris was competent at the time she entered her plea and explained that his standard practice would have been to ensure that she understood, in relevant part, what she was pleading to, including the nature of the charges and potential consequences of pleading guilty or proceeding with trial. The credibility of plea counsel's testimony was for the trial court to determine. See *Johnson*, 303 Ga. at 707 (2) (citation omitted). Moreover, in denying Harris's motion to withdraw, the trial court specifically noted that Harris "admitted that there was a

sufficient factual basis for the charge, and that [s]he did in fact commit the offense of murder, armed robbery, and possession of a firearm during the commission of certain crimes."

On appeal, Harris cites medical journals in support of her argument, but none of those are part of the record that was before the trial court. See *Caine v. State,* 266 Ga. 421, 422 (467 SE2d 570) (1996) (dismissing direct appeal of guilty plea where claims about involuntariness of plea could not be resolved by facts appearing in the existing record). And Harris did not introduce any witnesses or evidence that called into doubt her understanding of the proceedings or the consequences of her plea.

In sum, the trial court did not err in determining that Harris entered her plea of her own free choice, with sufficient awareness of the relevant circumstances and likely consequences. The trial court therefore acted within its discretion when it denied Harris's motion to withdraw her guilty pleas.

*Judgment affirmed. All the Justices concur.*